IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 JUL 26 PM 3: 47

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

UNITED STATES OF AMERICA,

    Plaintiff,

v.                            No. 05-20204 B

WARD CRUTCHFIELD,

    Defendant.

---

ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR
IMPROPER VENUE OR, IN THE ALTERNATIVE, TO TRANSFER TRIAL
TO THE EASTERN DISTRICT OF TENNESSEE

---

In a two-count indictment entered May 25, 2005, the Defendant, Ward Crutchfield, was charged along with Charles Love with conspiracy to obstruct, delay and affect commerce by means of extortion and conspiracy to engage in theft or bribery concerning programs receiving federal funds, in violation of 18 U.S.C. §§ 1951 and 666, respectively. Crutchfield, a resident of Chattanooga, Tennessee, is an elected member of the Tennessee State Senate from the Tenth Senate District who served in the 103rd and 104th Tennessee General Assemblies. The General Assembly sits in Nashville, the capital of Tennessee. Before the Court is the Defendant's[1] motion to dismiss the indictment entered in this case on the grounds of improper venue or, in the alternative, to transfer the matter to the United States District Court for the Eastern District of Tennessee, Southern Division, to which the Government has responded and the Defendant has replied. As the Court finds that this matter may appropriately and adequately be determined on the parties' submissions, requests

---

[1] The term "Defendant" as used herein refers only to Crutchfield unless otherwise specified.

This document entered on the docket sheet in compliance with Rule 55 and/or 32(b) FRCrP on 7-27-05

42

for oral argument are DENIED.

The charges against Crutchfield and Love arise from Operation Tennessee Waltz, a multi-year investigation initiated in response to allegations of corruption by Tennessee elected officials. The investigation was directed by the United States Attorney's Office in Memphis, Tennessee and carried out by agents of the Federal Bureau of Investigation ("FBI"). As part of the sting operation,[2] agents created a fictitious company called E-Cycle Management, Incorporated ("E-Cycle"), which was purportedly headquartered in Atlanta, Georgia with offices in Nashville and Memphis, Tennessee. The sham company was engaged in the business of obtaining and disposing of obsolete electronic equipment by salvaging it at a location outside the United States. Defendant Love allegedly represented to certain persons, including agents whom he believed were associates of E-Cycle, that he could influence, collect money for, and act as a "bag man" for members of the Tennessee legislature amenable to illegally sponsoring and voting for legislation in exchange for money. Crutchfield was, according to Love, just such an individual. During meetings in Memphis, Tennessee in July and August 2004, the indictment claimed that Love advised E-Cycle representatives that he had on previous occasions paid legislators, including the Defendant, to pay "more attention" to certain legislation the contributors of the cash wished to become law.

According to the indictment, in September 2004, Love and an E-Cycle representative met with Crutchfield in Chattanooga, during which Love explained to the Defendant that the undercover business wanted the legislator to support a certain bill that would be beneficial to E-Cycle. A few days later, Love advised E-Cycle that the Defendant wanted a certain amount of money in exchange

---

[2]The Sixth Circuit has recognized that "undercover operations are sometimes necessary in political corruption cases." Commonwealth of Ky. v. Long, 837 F.2d 727, 749 (6th Cir. 1988).

2

for supporting the bill. Funds were sent via wire transfer from the Western District of Tennessee to Love's bank account in Chattanooga. It is alleged that, on the same day, payment was made on behalf of E-Cycle by Love to Crutchfield in Chattanooga.

In October 2004, Love met with an agent in Memphis for the purpose of discussing how additional moneys would be paid to Crutchfield. Love and the E-Cycle representative then drove from Memphis to Chattanooga to make the delivery in person. On October 13, 2004, the two met at the Defendant's Chattanooga office, at which time Love advised that he had given the money, enclosed in an envelope addressed to "W.C.," to Crutchfield's secretary. In a meeting later that day with Crutchfield, the Defendant told the E-Cycle representative that "we will do whatever you want us to do" after being informed by his secretary that E-Cycle "was mighty nice to us today."

The United States Constitution requires that all criminal trials "shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. Similarly, the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. "These constitutional provisions are implemented by Rule 18 of the Federal Rules of Criminal Procedure," United States v. Williams, 788 F.2d 1213, 1215 (6th Cir. 1986) (citation omitted), which provides that, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place for trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice." See Fed. R. Crim. P. 18.

Venue may be proper in more than one location. United States v. Williams, 274 F.3d 1079, 1084 (6th Cir. 2001). Title 18 U.S.C. § 3237 states that "[e]xcept as otherwise expressly provided

3

by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." See United States v. Scaife, 749 F.2d 338, 346 (6th Cir. 1984), reh'g and reh'g en banc denied (Jan. 21, 1985) (applying § 3237 to prosecution under the Hobbs Act). The Sixth Circuit has held that "venue is proper in conspiracy prosecutions in any district where the conspiracy was formed or in any district where an overt act in furtherance of the conspiracy was performed." Id. To satisfy the statute, "[a] conspiracy defendant need not have entered the district so long as this standard is met." Id.; see also United States v. Zidell, 323 F.3d 412, 422 (6th Cir.), cert. denied, 540 U.S. 824, 124 S.Ct. 178, 157 L.Ed.2d 46 (2003).

More generally, this Circuit has evaluated venue questions pursuant to the "substantial contacts" test, under which the Court "takes into account a number of factors--the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding." Williams, 274 F.3d at 1084 (citing Williams, 788 F.2d at 1215; United States v. Reed, 773 F.2d 477, 481 (2d Cir. 1985)). "The government must prove that venue was proper as to each count charged." United States v. Wood, 364 F.3d 704, 710 (6th Cir. 2004); see also United States v. Branan, 457 F.2d 1062, 1065 (6th Cir. 1972) ("There can be no question about the obligation of the Government to establish proper venue in a criminal prosecution."). Whether to grant a motion to dismiss based on improper venue lies within the discretion of the trial court. United States v. Hunter, 863 F.Supp. 462, 470 (E.D. Mich. 1994).

The Defendant first argues that the aiding and abetting count under 18 U.S.C. § 2 should be dismissed for improper venue. Although the indictment cites the statute, it does not specifically

4

charge Crutchfield with aiding and abetting under § 2, which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission," or "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States" "is punishable as a principal." 18 U.S.C. § 2(a) & (b). Aiding and abetting has been described as an alternate theory of liability as opposed to a substantive offense. An indictment need not even charge a § 2 violation in order to support a jury verdict based upon a finding of aiding and abetting. Rather, § 2 is embodied in every federal indictment for a substantive offense, whether set forth explicitly or implicitly. See United States v. Taniguchi, Nos. 00-4495, 00-4496, 49 Fed. Appx. 506, 520 (6th Cir. Oct. 11, 2002); United States v. Camacho, 233 F.3d 1308, 1315 (11th Cir. 2000), cert. denied, 532 U.S. 951, 121 S.Ct. 1423, 149 L.Ed.2d 363 (2001); United States v. Hill, 55 F.3d 1197, 1204 (6th Cir. 1995); United States v. Armstrong, 909 F.2d 1238, 1241 (9th Cir.), cert. denied, 498 U.S. 870, 111 S.Ct. 191, 112 L.Ed.2d 153 (1990); United States v. Maselli, 534 F.2d 1197, 1200 (6th Cir. 1976); United States v. Lester, 363 F.2d 68, 72 (6th Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967). Thus, an indictment under a substantive statute *and* Section 2 is the functional equivalent of an indictment under the substantive law alone. Armstrong, 909 F.2d at 1243 (citation omitted). The section merely "describes the kinds of individuals who can be held responsible for a crime; it defines the degree of criminal responsibility which will be attributed to a particular individual. The nature of the crime itself must be determined by reference to some other statute." Id. (citation omitted). As a consequence, the Court finds Defendant's argument unpersuasive.

Crutchfield refers the Court to two cases in support of his position in favor of dismissal which fail to persuade the Court. United States v. Sweig, 316 F.Supp. 1148 (S.D.N.Y. 1970) is cited

5

for the proposition that venue for a principal under an aiding and abetting theory, assuming Crutchfield is considered a principal in this prosecution, may not be established outside the district in which the crime was committed based on the acts of an accessory. As a consequence, the Defendant argues, he cannot be forced to stand trial in this district solely based on Love's accessorial acts here. However, the Sweig court dealt specifically with a *non-continuous* substantive count (unlawful appearance of a government employee before a government agency on behalf of a third party). See Sweig, 316 F.Supp. at 1159-63 ("The fact that preparations, even essential ones, [by an accessory] may take place 'elsewhere,' and that effects may radiate widely, does not render a discrete and identifiable wrong 'continuing' so as to give the prosecution a choice of two or more districts in which to prosecute.").³ In doing so, the court took great pains to distinguish the facts before it from those involving the multiple venues available in prosecutions for *continuous* crimes, which include conspiracy. Id.; see also United States v. Robertson, 67 Fed. Appx. 257, 269 (6th Cir. May 9, 2003) ("conspiracy is a continuing crime") (citing United States v. Edgecomb, 910 F.2d 1309, 1312 (6th Cir. 1990); Williams, 274 F.3d at 1083-84 (conspiracy is a continuing crime, and "venue is proper in any district along the way"). Similarly, the court in United States v. Walden, 464 F.2d 1015 (4th Cir.), cert. denied sub nom. Ard v. United States, 409 U.S. 867, 93 S.Ct. 165, 34 L.Ed.2d 116 (1972) addressed the non-continuing substantive crime of bank robbery, while recognizing that continuing crimes such as conspiracy may be tried in more than one district. See Walden, 464 F.2d at 1018-20.

The movant contends that venue is also improper with respect to the conspiracy counts,

---

³The defendant's motion to dismiss the conspiracy count in Sweig, which alleged a number of overt acts described generally as having occurred in the Southern District of New York, the District of Columbia, and elsewhere, was denied without discussion. Sweig, 316 F.Supp. at 1159.

6

averring that the meetings between Defendant Love and Government agents, without his presence, were "prior and preparatory" to any conspiracy alleged to involve Crutchfield. At the outset, the Court recognizes that a conspiracy may be based on a tacit understanding among co-conspirators. A formal agreement is not necessary. See United States v. Hamilton, 263 F.3d 645, 652 (6th Cir. 2001), cert. denied, 535 U.S. 1007, 122 S.Ct. 1584, 152 L.Ed.2d 502 (2002). "A conspirator need not have personally performed the deed for which he is being held liable. A conspirator can be held criminally liable for the actions of his co-conspirators committed during and in furtherance of the conspiracy." Id. (citation omitted). Therefore, Crutchfield may be held liable for the acts of his co-conspirator, Charles Love.

In presenting his argument, the Defendant points to the Second Circuit's decision in United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181 (2d Cir.), cert. denied sub nom. Lavery v. United States, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989), for the proposition that "prior and preparatory" acts cannot establish venue. In Beech-Nut, two of the defendants challenged on venue grounds their convictions as to substantive counts of violating the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331(a). Beech-Nut Nutrition Corp., 871 F.2d at 1183-84. The charge, prosecuted in the Eastern District of New York, arose from the alleged introduction of adulterated or misbranded apple juice into interstate commerce. Id. at 1183, 1189. The court, noting that "it is helpful to examine the 'key verbs' used by the statute in defining the offense," observed that the substantive crime at issue prohibited the "introduction or delivery for introduction into interstate commerce . . . any food . . that is adulterated or misbranded." The offense consisted of "putting into the stream of interstate commerce adulterated or misbranded food or the sending of illicit goods across state lines." Id. at 1189 (internal citations and quotation marks omitted). The court concluded that

7

telephoning brokers in the Eastern District of New York to place orders for the adulterated apple juice and mailing confirmations for the orders into the district

> were not part of the offense of "introducing" the offending juice into commerce but were merely prior and preparatory to that offense. Whether the crime be continuing or noncontinuing, venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense.

Id. at 1190 (quotation marks supplied).

Even if the strict venue standard espoused in Beech-Nut were considered persuasive by this Court, it must be recognized that the decision has sparse support within the Second Circuit itself. In United States v. Knight, 822 F.Supp. 1071 (S.D.N.Y. 1993), the district court cautioned that Beech-Nut "has been criticized and regarded as unduly narrow in its disposition of the venue point," while reluctantly conceding that it must be followed by courts in the Second Circuit until overruled. Knight, 822 F.Supp. at 1076 (citing United States v. Stephenson, 895 F.2d 867 (2d Cir. 1990); United States v. Delia, 944 F.2d 1010 (2d Cir. 1991); United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991)). In one of its most recent visits to Beech-Nut, the Second Circuit, in United States v. Kim, 246 F.3d 186, 191 (2d Cir. 2001), instructed that its tradition of looking to 'key verbs' to define what was and was not part of a criminal offense as set forth in Beech-Nut was of questionable viability in light of United States v. Rodriguez-Moreno, 526 U.S. 275, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999), in which the Supreme Court "warned against an overly rigid application of the key verb test." Kim, 246 F.3d at 191.

Beech-Nut has been cited by a panel of this circuit in the unpublished decision of United States v. Berry, No. 93-5376, 1994 WL 100274 (6th Cir. Mar. 24, 1994), cert. denied, 513 U.S. 912, 115 S.Ct. 285, 130 L.Ed.2d 201 (1994). In Berry, the defendants were prosecuted in the Eastern

8

District of Kentucky for conspiring to possess with intent to distribute cocaine based on allegations that they traveled from Kentucky to Texas, where they purchased the drugs from undercover agents. Berry, 1994 WL 100274, at *1. In their objection to venue, the defendants contended that no overt acts in furtherance of the conspiracy occurred in Kentucky. Id. Citing to Beech-Nut's statement that preparatory acts are insufficient to establish venue, the court set out to determine whether a showing had been made that the defendants "agreed to purchase the cocaine in Texas some time before they left the Eastern District of Kentucky." Id. at *2. The defendants contended that they only *discussed the possibility* of purchasing the cocaine while in Kentucky and that the decision was not set until they reached Texas. Id. at *3. The court rejected the argument, finding that, once the defendants reached Texas and met with the agents, they telephoned a co-defendant in Kentucky and told him to fly to Texas from Kentucky with money to pay for the drugs. It was understood that the money came from Kentucky. Id. Beyond its mere citation to Beech-Nut with respect to preparatory acts, the Sixth Circuit gave no indication as to whether it approved or disapproved of the Second Circuit's decision, although it appears Beech-Nut's strict venue construction was not followed in Berry.

In this case, of course, the Court is not bound by the decisions of the Second Circuit. Here, the Defendant seeks to narrow the focus of the Court's consideration to include only "preparatory" meetings between Love and Government agents in Memphis, while ignoring his role as a co-conspirator and other allegations in the indictment which clearly support a finding that additional acts in furtherance of the conspiracy occurred in the Western District of Tennessee. Specifically, the indictment alleges that money to pay Crutchfield for supporting the bill on behalf of E-Cycle was wired from this district and that, upon his receipt of the money from Love, the Defendant allegedly knew the identity and location of the source. According to the Government, when Love and the E-

9

Cycle representative traveled from Memphis to Chattanooga to make the additional payment in person, again, Crutchfield was aware, as were the defendants in Berry, of whence they and their money came. The Court finds no support for the theory that these acts were "preparatory" and therefore insufficient to support venue. Accordingly, the Court concludes, based on the information before it, that dismissal of the indictment on the grounds that the acts of the conspirators in the Western District of Tennessee were preparatory is unavailing.

Crutchfield also avers that venue was unlawfully "manufactured" by the Government in this district, in support of which he cites to United States v. Archer, 486 F.2d 670 (2d Cir. 1973).[4]

> In Archer, federal agents investigating corruption in the New York criminal justice system arranged the sham arrest and arraignment of an undercover agent, who then made it known that he would pay to avoid trial or conviction. Archer, a local district attorney, took the bait and accepted a bribe. Belatedly realizing that there was no basis for federal jurisdiction, the agent made a telephone call from out-of-state to Klein, a lawyer conspiring with Archer. Klein returned his call, and, on the basis of that return call, the government prosecuted Archer and his co-defendants in federal court for using a facility in interstate commerce . . .

United States v. Peters, 952 F.2d 960, 962 (7th Cir.), cert. denied, 503 U.S. 911, 112 S.Ct. 1277, 117 L.Ed.2d 503 (1992) (citing Archer). While reversing the defendants' convictions on other grounds, the Second Circuit went on to vent its distaste for the conduct of the government agents, stating thusly:

> [W]hen Congress responded to the Attorney General's request to lend the aid of federal law enforcement to local officials in the prosecution of certain crimes, primarily of local concern, where the participants were engaging in interstate activity, it did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present. Manufactured federal jurisdiction is even more offensive in criminal than in civil proceedings.

---

[4]The defendants in Archer were charged with violation of the Travel Act, 18 U.S.C. § 1952. Archer, 486 F.2d at 672.

\*     \*     \*

> [T]he Government agents displayed an arrogant disregard for the sanctity of the state judicial and police processes. The investigators apparently permitted their deserved contempt for corrupt practitioners in the Queens criminal justice system to spill over into disdain for all the participants in the system -- including the police, the courts, and the members of the grand jury, all of whom were subjected to the Government's fabrications. While this pattern of deception may be less serious than some forms of governmental participation in crime that can be hypothesized, it is substantially more offensive than common cases where government agents induce the sale of narcotics in order to make drug arrests.

Archer, 486 F.2d at 677, 682. It is the position of the Defendant that federal agents posing as E-Cycle representatives met with Love in Memphis solely for the purpose of establishing venue here, just as the defendants in Archer attempted to "manufacture" federal jurisdiction.

In response, the Government points out that Archer too has been criticized in subsequent decisions, citing the Seventh Circuit's determination in Peters, in which the court articulated that

> [t]his circuit has addressed Archer only on a few occasions. Summing up our own and other circuits' decisions on the issue, we stated in United States v. Podolsky, 798 F.2d 177, 181 (7th Cir. 1986) (citing cases), that the course of decisions casts doubt on the vitality of the independent principle announced in Archer that forbids the "manufacture" of federal jurisdiction in circumstances not constituting entrapment and not canceling any element of the crime such as criminal intent. Nonetheless, the possibility that a case might arise where federal jurisdiction would be inappropriate because it was "manufactured" has not been completely foreclosed. We do not foreclose it now; yet we cannot agree with Mr. Peters that in the present case federal jurisdiction was inappropriate because "manufactured."

Peters, 952 F.2d at 962-63 (internal citations, footnotes and quotation marks omitted).[5] The Sixth Circuit has also found the Archer decision to be of limited, if not questionable, value, noting that "[i]ndeed, courts that have construed Archer have taken pains to limit its applicability and to explain

---

[5] This Defendant has not sought dismissal of this prosecution based on entrapment or because the elements of the offenses charged have not been met.

11

that 'manufactured jurisdiction' as an independent doctrine is a dubious concept." See United States v. Burdette, 86 Fed. Appx. 121, 127 (6th Cir. Jan. 16, 2004); see also United States v. Petit, 841 F.2d 1546, 1553 (11th Cir.); cert. denied sub nom. Fernandez v. United States, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988) ("federal courts have been extremely reluctant to set aside convictions on the sole basis of the principle announced in Archer").

Sixth Circuit courts considering an Archer challenge have found it inapplicable. The defendant in Burdette, who lived in West Virginia at the time of the offense, convinced her lover, Stephen Adams, to have her husband murdered. Burdette, 86 Fed. Appx. at 123. Adams approached a fellow Army soldier stationed in Kentucky, Michael Myott, to perform the killing, who in turn notified military authorities. Id. at 123-24. After Myott phoned Adams, on the government's instructions, advising him that he knew someone who could kill Burdette's husband, an agent phoned Adams and the defendant, posing as the "hit man." Id. at 124. These calls were initiated by the government from Kentucky and Tennessee. Id. at 127. In rejecting Burdette's Archer argument to jurisdiction in Tennessee, the court concluded that the telephone calls from Tennessee were initiated by the cooperating individual's government contacts and that they were merely a part of the overall plan to kill the husband. Those contacts did not *create* the criminal offense. Id.

Similarly, in United States v. Williams, No. 92-5658, 1993 WL 492296 (6th Cir. Nov. 29, 1993), the defendant, Cordelia Williams, a Kentucky resident, plotted, along with her brother Danny, to have her estranged husband murdered. Williams, 1993 WL 492296, at *1. Danny Williams contacted a fellow trucker, who lived in Louisiana, to see if he could commit the crime or refer him to someone who could. Id. The trucker called local FBI agents, who instructed him to phone Cordelia Williams from Louisiana and introduce to her an undercover agent posing as a hit man.

Id. The defendant later forwarded to the "hit man" $200 via money order from Kentucky to Louisiana. Id. at *3. The court found <u>Archer</u> inapplicable, as the contacts with Louisiana simply facilitated the murder-for-hire scheme and were not meant to manufacture jurisdiction. Id.

The court in <u>United States v. Degan</u>, 229 F.3d 553 (6th Cir. 2000) reached a like conclusion in another murder-for-hire case. In <u>Degan</u>, the defendant, a resident of Tennessee, met James Lee Noel, whom he later asked to consider killing Degan's wife. <u>Degan</u>, 229 F.3d at 555. The defendant asked Noel, who lived in Mississippi, to come to Tennessee to further discuss his offer. Id. Upon arriving in Memphis, Noel contacted the FBI, which fitted him with a recording device, permitting government agents to hear the details of the planned crime. Id. Degan and Noel agreed that the latter would return to Memphis the following week and travel from there to Florida to commit the murder. Id. at 555-56. The defendant sought application of <u>Archer</u>, contending that, as Noel had entered into a cooperating relationship with the government by the time he made the second trip to Tennessee, *he* could not have caused Noel to travel from Mississippi to Tennessee. Thus, the argument went, the government "manufactured" jurisdiction in Tennessee. Id. at 557. The Sixth Circuit rejected the defendant's assertion, finding that because Noel went from Mississippi to Tennessee with Degan's knowledge and at his request, it could not be said that the government manufactured jurisdiction. Id.

One of the most recent circuit cases to address <u>Archer</u> is <u>United States v. Skoczen</u>, 405 F.3d 537 (7th Cir. 2005). In <u>Skoczen</u>, federal agents instituted a "sting" operation involving the defendant's cousin, who was cooperating with government customs agents. <u>Skoczen</u>, 405 F.3d at 541. Skoczen, his cousin and an undercover agent, posing as a thief looking for a buyer for some 50,000 cartons of Marlboro cigarettes, met to discuss the possibility of locating a purchaser. Id.

13

Skoczen indicated that he was interested, but only wanted Marlboro cigarettes in a hard pack. Id.

> [I]n preparation for the arrest, the agents borrowed approximately 325,000 packs of cigarettes from a Philip Morris facility in Virginia. To get them to Illinois[, where the case was being prosecuted], a Customs agent drove to Richmond, Virginia, in a Customs department trailer, picked up the cigarettes, and drove them back to Illinois. Customs parked the trailer in a warehouse until it was time to deliver them to Skoczen and his co-conspirators.
>
> [Following more meetings and negotiations,] [t]he agents met Skoczen and his associates in a parking lot where they were to inspect the contents and unload the trailer. When they satisfied themselves that everything was in order, they paid the agents. Skoczen's associate unhooked the trailer from the Customs' tractor and hooked it to his own tractor. The agents then arrested Skoczen and his associates.

Id. Skoczen argued that government agents manufactured jurisdiction by moving the cigarettes from Virginia to Illinois and that they did so for the purpose of creating federal jurisdiction in Illinois, analogizing the case with Archer. Id. at 541-52. The Seventh Circuit, observing that "[n]o case has ever turned on the principle set forth in Archer," found it equally unavailing in the case before it. Id. at 543-44. The court determined that "[i]n procuring the load [of cigarettes], the government merely was affording the opportunity and facilities for the commission of the offense charged; the participants were awaiting any propitious opportunity, and never considered themselves limited by boundaries." Id. at 544 (citation and internal quotation marks omitted).

In applying the law to the facts in this case, and analogizing the decisions involving federal jurisdiction to the instant challenge to venue, the Court finds no evidence whatever to suggest that federal agents engaged in the outrageous conduct condemned in Archer. According to the indictment, Crutchfield, along with his co-conspirator, allegedly responded to an opportunity afforded by the Government to engage in activities in which they had participated on previous occasions, without consideration to which part of the state of Tennessee the opportunity presented

14

itself. The contacts with this district were merely part of the conspiracy. The circumstances of this case, involving inducement of the sale of favors by public officials, are, in this Court's view, clearly akin to the "common cases where government agents induce the sale of narcotics in order to make drug arrests," which the Archer court found "substantially [less] offensive" than the facts before it. See Archer, 486 F.2d at 677. Based on the foregoing, the motion to dismiss the indictment is DENIED.

In the alternative, the Defendant seeks transfer of the trial in this matter to the Eastern District of Tennessee, Southern Division, pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure. The Rule provides that, "[u]pon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties and witnesses and in the interest of justice." Fed. R. Crim. P. 21(b). In Platt v. Minnesota Mining & Mfg. Co., 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964), the Supreme Court cited with approval a list of factors pertinent to a determination of whether a case should be transferred "in the interest of justice," including "(1) location of [the] defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer." Platt, 376 U.S. at 243-44, 84 S.Ct. at 771; see also United States v. Collins, No. 91-5215, 1992 WL 31302, at *4 (6th Cir. Feb. 20, 1992); United States v. Ashland Oil, Inc., 457 F.Supp. 661, 663 (W.D. Ky. 1978); 2 Charles Alan Wright, Federal Practice and Procedure § 344 (3d ed. 2000). The burden rests on the Defendant to demonstrate that transfer would serve the purposes of the Rule. United States

15

v. Tripp, Nos. 91-5129, 91-5130, 1991 WL 203756, at *5 (6th Cir. Oct. 7, 1991). Whether to transfer a case to another district lies within the discretion of the trial judge. Collins, 1992 WL 31302, at *4. It is further within the Court's discretion to balance the Platt factors and to determine which factors are to be given greater weight. Id. "Ordinarily the various factors appear in combination, with some pointing in favor of transfer and others against transfer." 2 Charles Alan Wright, supra, at § 344.

In support of his motion, the Defendant contends that both he and Love reside in Chattanooga, as do his character witnesses and office staff; most of the overt acts alleged occurred in Chattanooga; relevant documents are located in Chattanooga and Nashville, and any Memphis documents can easily be delivered to the Eastern District; travel to Memphis for Court appearances will disrupt his Chattanooga law practice; he and his witnesses will be required to incur travel expenses; trial counsel is located in Nashville, which is closer to Chattanooga than Memphis; and his age (76) and heart condition are special circumstances favoring trial in his home district.

In response, the Government advises the Court that, as a legislator, the Defendant often travels from Chattanooga to other parts of the state; almost all of its witnesses are located in Memphis or out-of-state and can be more easily accommodated in Memphis than Chattanooga; all pertinent records are located here; and judicial economy would be thwarted if Crutchfield's trial is moved to Chattanooga, as Love has not requested transfer.[6]

The Court notes at the outset that "[c]riminal defendants have no constitutional right to have a trial in their home districts, nor does the location of the defendant's home have independent

---

[6]In his reply, the Defendant advises the Court that Love's counsel expressed no opposition to his motion to transfer.

16

significance in determining whether transfer to that district would be in the interest of justice." United States v. Zylstra, 713 F.2d 1332, 1336 (7th Cir.), cert. denied, 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983) (internal quotation marks omitted); see also Platt, 376 U.S. at 245-46, 84 S.Ct. at 772. Moreover, the Defendant has failed to persuade the Court that the factors in his favor outweigh those proffered by the Government in support of keeping this prosecution in the Western District of Tennessee. In reviewing the particular facts of this case, the Court concludes that the Defendant has failed to establish that transfer is "in the interest of justice." Accordingly, the motion to transfer is also DENIED.

IT IS SO ORDERED this 25th day of July, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

17

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 42 in case 2:05-CR-20204 was distributed by fax, mail, or direct printing on July 27, 2005 to the parties listed.

---

Jonathan P. Farmer
FARMER & LUNA
333 Union St.
Ste. 300
Nashville, TN 37201

William H. Farmer
FARMER & LUNA
333 Union St.
Ste. 300
Nashville, TN 37201

Timothy R. DiScenza
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Honorable J. Breen
US DISTRICT COURT